Helen E. McNAMARA
and
John F. McNamara, Plaintiffs
v.
UNITED STATES of America,
Defendant.

Civ. A. No. 3768-60.

United States District Court
District of Columbia.

Dec. 16, 1961.

880

Sidney A. Cohen, Washington, D. C., for plaintiffs.

David Acheson, U. S. Atty., Sylvia A. Bacon and Joseph M. Hannon, Asst. U. S. Attys., Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is an action against the United States under the Federal Tort Claims Act to recover damages for personal injuries sustained by the female plaintiff, Helen E. McNamara, and for loss of services suffered by her husband, John P. McNamara, the male plaintiff, as a result of his wife's injuries.

The facts out of which this case arose are not in dispute. The two plaintiffs and their son were visitors to Washington on the day in question in this case. As is true of numerous sightseers, they went to see the Capitol. They were walking along the corridor leading from the center of the building to the Senate wing. As they walked along, Helen McNamara slipped and fell on the floor near the point where there is a door from the corridor leading to the Senate Restaurant. She sustained serious injuries as a result of her fall.

This suit is grounded on alleged negligence on the part of the United States in the maintenance of the floor of the Capitol building where the female plaintiff fell. It is claimed that the floor, through the course of time, had become somewhat worn and uneven and, therefore, dangerous to passersby, and that this condition had reached such a degree as to constitute a violation of the duty of the Government to keep the place in a reasonably safe condition for those who were going to use it. There is no claim that there was any foreign substance on the floor or that anything else caused the plaintiff to fall except that the floor had become slippery, worn and dangerous as a result of continuous wear by millions of pedestrians over the many years of the existence of the Capitol.

At the outset of the trial the Government interposed two preliminary objections concerning which a word should be said. The first objection was that this action did not lie as a matter of law in that the scope of the Federal Tort Claims Act was limited to the Executive Branch of the Government and did not comprise the activities of the Legislative or Judicial Branches. The Court overruled this objection and is adhering to its ruling, after further consideration.

The Federal Tort Claims Act is a comprehensive statute, the purpose of which was to waive governmental immunity to suit in tort which this country originally inherited from the immunity accorded to the King of England, and it might be said in passing that the British Sovereign has also waived immunity to suit in tort some years ago. The Act was a far-reaching reform in jurisprudence. It was the work of many minds over many years, and unlike other statutes waiving governmental immunity to suit in specific matters, this statute should receive and has received a liberal construction. When we look at the phraseology of the statute it is not limited to the Executive Branch of the Government. It refers to the liability of the United States (28 U.S.Code, § 1346) and to the negligent or wrongful act or omission of any employee of the Government. There is no limitation there to the Executive Branch of the Government or to the employees of the Executive Branch of the Government.

It is true, as is pointed out by Government counsel, that 28 U.S.Code, § 2671, describes the meaning of the term "federal agency". It should be observed that this is not an exclusive definition, but provides that the term "federal agency" shall include certain branches of the Government. It is obvious that the purpose of that definition was to make certain that government-owned corporations and government-controlled corpora-

tions should be included as branches of the Government for the purpose of the Federal Tort Claims Act. The Court is unable to see any other purpose of that clause.

Finally, there is no legislative history indicating any desire or intention to limit the statute in the manner contended in this case. It is the view of this Court that to adopt such a narrow limitation would defeat a part of the beneficent purposes of the statute. For this reason, the Court adheres to its ruling that the statute applies to all three branches of the Government.

■■ The second preliminary objection was of a different nature. While the Federal Tort Claims Act constitutes a general waiver on the part of the Federal Government of immunity to suit in tort, there are certain torts that are expressly excepted from the Act. They are listed in 28 U.S.Code, § 2680. The Court is of the opinion that these exceptions should be narrowly construed. One of the exceptions contained in Paragraph (a) of this Section is a claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty. This clause has been somewhat troublesome because its meaning is, at times, difficult to discern. Does it mean that no claim can be predicated on an error of judgment in determining whether to perform or not to perform a function that is discretionary, or does it mean, as well, negligence in the performance of such a function? The Court is of the opinion that the phrase should be limited to the first alternative. It is inconceivable that if the Government undertakes to perform a discretionary function and does it negligently, thereby injuring somebody, such an act should be excepted from the Federal Tort Claims Act.

It is not necessary, however, for the purposes of this case to determine the exact meaning of the words discretionary function or duty. It may be that designing a building is a discretionary function, but maintenance of a safe condition within a building is not a discre-

tionary function. By way of illustration the Court might refer to its decision, when sitting in the Southern District of California, in Peets v. United States, D.C., 165 F.Supp. 177, in which the plaintiff was awarded damages for personal injuries caused by an unsafe condition of a ramp leading from a public building on a military base. Consequently, the Court is of the opinion that this case is not within the exception of discretionary duties or functions and, therefore, adheres to its ruling made at the opening of the trial overruling this objection on the part of the Government.

■■■ This brings us to the merits of this case, and this case should be and will be decided on the merits. Under the Federal Tort Claims Act the Government is liable in the same manner and to the same extent as would be a private individual under like circumstances. The substantive rights of the plaintiff and of the defendant in such a case must be measured by the law of the state in which the cause of action arose. In this instance, it is the District of Columbia. Consequently, the tort law of the District of Columbia governs the plaintiffs' rights and the defendant's liabilities.

■ Counsel for the plaintiffs cogently argued that the liability of the defendant in this case would be somewhat similar to the liability of an owner of a building that the public was invited to use. The Court considers this analogy a reasonable one and applicable here. There is, however, one difference that must be considered, though this distinction, as the Court indicated during the oral argument, is not decisive. Under the law of the District of Columbia a sightseer in a public building is not an invitee but is a licensee by invitation. Firfer v. United States, D.C.Cir., 208 F. 2d 524, 527, 528. In this respect a sightseer in a public building differs from a customer in a store because a customer in a store is an invitee. The Court is of the opinion however, that the same result would be reached whether these plaintiffs are regarded as invitees or licensees by invitation and, therefore,

will give no further consideration to that distinction beyond having pointed it out.

█ Passing now to the duty of a person who either owns or operates real property into which he invites the public to enter, be it an office building, a store or a building housing a Government department, it is well settled in the District of Columbia that the owner or the operator of such premises is not an insurer of the safety of the property to all persons entering it, but is only under a duty to maintain it in a reasonably safe condition. Brodsky v. Safeway Stores, 80 U.S.App.D.C. 301, 152 F.2d 677; F. W. Woolworth v. Williams, 59 App.D.C. 347, 41 F.2d 970.

█ There is another line of cases that is analogous. They involve the duty of the District of Columbia to maintain streets and other highways in a reasonably safe condition. There, too, it is held that the District of Columbia is not an insurer of the safety of every passerby, but is liable only for failure to maintain the streets and highways in a condition that is reasonably safe. Thus, in Campbell v. District of Columbia, 64 App. D.C. 375, 378, 78 F.2d 725, 728, Judge Groner said:

> "The District is not an insurer of the safety of travelers upon its streets. It is a sufficient discharge of its duty if it maintains its streets and roadways in a reasonably safe condition for travel in the ordinary modes."

█ We shall now proceed to apply these principles of law to the facts of this case. The plaintiffs claim that the floor of that portion of the Capitol where the female plaintiff fell was unsafe because there were depressions in some of the tiles of a rather minute character and of a hardly perceptible extent to the naked eye of the untrained observer.

It is necessary to bear in mind the nature of the building with which we are concerned in this case. The Capitol is not a utilitarian or functional structure such as a store, an office building, or even an ordinary Government building. It is a monumental edifice. It has an historical significance. It stands at the crest of a hill with its high and lofty dome visible on a wide radius as a symbol of national unity and majesty. It is a thrilling sight to see the pinnacle of the Capitol loom into view as one approaches the city of Washington by water up the Potomac River.

Necessarily, the historical character of the building must be preserved, and not only its historical character but also its architectural and artistic beauty, because it is an outstanding specimen of architecture. Also, it has an historical value and an historical significance. To be sure, because this is a young country we do not have buildings of ancient vintage such as Westminister Hall in London, but to us relatively the Capitol has as much historical significance as some of the buildings in the Old World that date back for centuries. Consequently, it is the duty of Government officials to preserve the historical, architectural and artistic beauty of the building.

As has just been stated, the exterior of the building is a magnificent specimen of art and architecture. It is necessary to maintain the interior in keeping and in harmony with the high character of the exterior, and this has been done. The walls are ornamental and dignified, and are decorated in many places by mural paintings and frescoes. The floors in the section of the Capitol in which this accident occurred are ornamental. The floor is laid with tile of various colors and hues and in places form designs of artistic nature. Some of them form figures on the floor. Some of the tiles in order to serve their artistic purpose are slightly raised from above the level of the floor, thereby forming a bas-relief, like the floors in some of the Old World cathedrals and churches.

The evidence in this case shows that the tile at this part of the floor of the Capitol was manufactured in England and brought to this country, and laid in the Capitol between 1855 and 1860. It is

of a decorative nature and is irreplaceable at this time, just as irreplaceable as the stained glass windows of some of the European cathedrals would be today.

The testimony shows that in the area involved in this case there are two types of tile, one type that has been called by the experts decorative and the other as brown tile. The Assistant Architect of the Capitol, Mario Campioli, was called as a witness. He testified that he took measurements with precision instruments and that as concerns the decorative tile the perimeter was, at times, between five-thousandths and eight-thousandths of an inch lower than the center, the tile itself being convex. He stated, however, that there were only some tiles of this type. As to the tiles referred to as brown tiles, he found that a few of them had depressions. The deepest that he generally found was one-twenty-fifth of an inch, although he did find one where the depth of the depression was three-thirty-seconds of an inch. The plaintiffs' expert did not substantially contradict this testimony, although his estimates of the depth of these depressions were slightly greater, but it must be noticed that he did not use precision instruments to arrive at his findings.

At the request of counsel and in their company the Court visited the *locus in quo* and inspected the floor. The Court observed the slight protuberances in the figures contained in the decorative tiles that formed the bas-relief. The depressions referred to in the other tiles are minute and almost microscopic, so that they were hardly noticeable, if at all, by the naked eye of an untrained observer. I walked up and down the floor, back and forth in various directions several times, and did not find it particularly slippery. It might have been because I wear rubber heels.

One of the difficulties that confronts the plaintiffs is that there is no evidence to sustain the plaintiff's claim that she fell on one of the tiles that had this minute microscopic depression. Such tiles are in a minority. She might have fallen on one of the other tiles. There is

a well-recognized principle of law that if two possibilities can be inferred from the evidence, neither one can be said to have been proved. But the Court is not going to dispose of this case on any such narrow consideration.

The Court is of the opinion that no negligence on the part of the Government has been shown in that the presence of these slight depressions of a minute character formed as a result of wear during a century or so caused by millions of people walking over the floor are not sufficient to make the floor unsafe or anything less than reasonably safe. Counsel has not cited and the Court has been unable to find by independent research a case where a depression so minute as exists in some of these tiles has been deemed sufficient to constitute such a defect as to render a floor unsafe, in using the test of reasonableness for that purpose.

There is no claim here, and there could not be, that these tiles are inherently dangerous. Necessarily, it is a matter of common knowledge that some materials are more slippery than others. Probably a wooden floor covered with a rug or a carpet would be less slippery or the least slippery, but such a floor would obviously be unsuitable for a monumental building such as the Capitol in Washington. Moreover, it might involve questions of fire hazard, which a stone or a tile floor does not involve. A marble floor would probably be even more slippery than tile or stone or a concrete floor, and, yet, there are public buildings in which the floor is made of marble and nobody would suggest that those floors ought to be torn up. It is proper for the Government to use discretion, within reason, in choosing material out of which to build walls or floors and it is only fitting that the choice should be in accord with the architectural and artistic design of the building in which the floor or walls are to be constructed.

The Court concludes that there has been no negligence shown on the part of the Government in the maintenance of the floor where the accident occurred. It

further concludes that there is no proof that the plaintiff's fall was proximately caused by any condition in the floor of the Capitol.

Accordingly, judgment will be rendered in favor of the United States dismissing the complaint on the merits.

A transcript of this oral decision will constitute the findings of fact and conclusions of law.