Lawrence **REIDINGER, Jr., Admr.,**
**et al., Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC.,**
**et al., Defendants.**

**No. 1341 and all related cases.**

United States District Court,
E. D. Kentucky,
Lexington Division.
June 18, 1971.

Lester & Reidinger, Newport, Ky., for plaintiffs.

O'Hara, Ruberg & Cetrulo, Covington, Ky., Chadbourne, Parke, Whiteside & Wolff, New York City, for Trans World Airlines.

Brumleve, DeCamp & Wood, Cincinnati, Ohio, Ware, Bryson, Nolan & West, Covington, Ky., Haight, Gardner, Poor & Havens, New York City, for General Dynamics.

Mendes & Mount, New York City, for Kollsman Instrument Corp.

Eugene Siler, U. S. Atty. by Philip Silverman and Gerard R. Lear, Aviation Unit, Dept. of Justice, Washington, D. C., for United States.

### MEMORANDUM

SWINFORD, District Judge.

The record is before the court on motions for summary judgment by 1) the plaintiffs, Lawrence Reidinger, Jr., et al, against Trans World Airlines, Inc. on the issue of liability, 2) the United States, a defendant, to dismiss the plaintiffs' complaint against it, 3) General Dynamics Corporation, a defendant, to dismiss the plaintiffs' complaint and Trans World Airlines, Inc.'s cross claim against it, and by 4) Kollsman Instrument Corporation, a third-party defendant, to dismiss the plaintiffs' complaint and General Dynamics Corporation's third-party complaint against it. Trans World Airlines, Inc. (hereinafter TWA) has opposed all motions for summary judgment. All of the interested parties have submitted narrative statements of the facts, statements of legal principles and memorandums of law.

From the various briefs and documents before the court it is clear that there is no genuine issue as to the facts material to the motions for summary judgment. The court therefore concludes that the United States, General Dynamic Corporation (hereinafter General Dynamics) and Kollsman Instrument Corporation (hereinafter Kollsman) must be absolved from liability for the aircraft accident, which is the subject matter of this litigation, and that the plaintiffs are entitled, as a matter of law, to a judgment against TWA on the question of liability.

A brief résumé of the facts and circumstances surrounding and leading up to the aircraft crash is as follows. On November 20, 1967, a Convair 880 jet aircraft, number N821TW, departed the Los Angeles International Airport as TWA flight number 128. It was scheduled to arrive at the Greater Cincinnati Airport at approximately 9:00 P.M. Eastern Standard Time. The flight crew, consisting of a Captain, a First Officer, a Flight Engineer, and four Stewardesses, were all qualified and certified for their respective assignments. At approximately 8:56 P.M., N821TW was cleared to land and commenced its approach to the Greater Cincinnati Airport. A weather observation taken at the Greater Cincinnati Airport at 8:55 P.M. reported light snow, a tower visibility of 1½ miles, an indefinite ceiling at 1,000 feet, and wind from 110° at seven knots. The crew apparently attempted to make a visual approach. The uncontested stipulated facts indicate that the required preliminary checklist callouts were made, however, the voice record of the onboard flight recorder reveals that the required "minimum level altitude" callout was not made by the First Officer. The minimum level altitude for a visual approach to runway 18 of the Greater Cincinnati Airport (the runway on which the Airport Controllers had directed N821TW to land) was 1,290 feet mean sea level, or 400 feet above the mean sea level of the runway. It is the required procedure for the First Officer of an aircraft making a visual approach to callout the minimum level altitude when the aircraft's altimeters indi-

cate that that altitude has been reached. If at that altitude the runway is not sighted, the aircraft's crew are required to execute a "missed approach" and await further instructions from the airport's Controllers and Dispatchers. N821TW descended past its minimum level altitude well in advance of the prescribed time (i. e. well in advance of a visual sighting of the runway). At approximately a distance of 9,357 feet from the approach end of the runway the aircraft contacted small trees at an elevation of 875 feet mean sea level (the mean sea level altitude of runway 18 was 890 feet). N821TW eventually came to rest 6,878 feet short of the runway and 442 feet to the right or west of the runway center line. Five of the seven crew members and sixty-five of the seventy-five passengers sustained fatal injuries as a result of the accident.

The fundamental issues upon which the liability of the party defendants must be decided are whether the crew knew or should have known of their altitude, speed and rate of descent prior to and up until the time of the crash, or whether the crew, because of instrument failure or dereliction of duty by tower Controllers, had reason to believe that they were executing their landing from a safe approach altitude at a safe speed. Succinctly put the basic issues are whether the accident was the result of the crew's negligence or whether it was attributable to instrument malfunction and Controller nonfeasance.

### GENERAL DYNAMICS AND KOLLSMAN'S MOTIONS FOR SUMMARY JUDGMENT

 It is the court's considered opinion that there has been no evidence presented, nor could any be adduced, that would warrant finding either General Dynamics or Kollsman liable for the aircraft accident. Accordingly the court is of the belief that no jury question has been raised, and that the motions to exonerate the above parties from liability must be sustained.

There is no evidence existing from which it could be affirmatively shown that the crash was proximately caused by instrument malfunction; in fact what little direct evidence there is, leads only to the conclusion that the aircraft's instruments functioned properly at all times.

N821TW was equipped with onboard flight instrument and voice recorders which recorded the first and last thirty minutes of the flight's instrument readings and crew conversations. The flight instrument recorder was connected to the same pitot and static tubes as were the instruments of the First Officer.* "Read-outs" from the flight instrument recorder performed by the National Transportation Safety Board exhibit that the recorder accurately indicated the aircraft's altitude, airspeed and rate of descent at all times prior to the crash. Assuming that the flight recorder's instruments functioned accurately and properly, it may be asserted by corollary that the First Officer's instruments, which received the same air pressure data as did the flight recorder, also operated in an accurate and proper manner.

Additionally, it is an uncontested fact that at the time the aircraft's electrical power ceased the Captain's altimeter showed an altitude of 856 feet mean sea level, and the First Officer's altimeter indicated an altitude of 899 feet mean sea level. These altitudes very nearly correspond to the mean sea level altitude of the trees into which the aircraft collided. In the absence of any contravening evidence, it must be inferred, insomuch as the crew's instruments exhibit-

* Pitot and static tubes are devices which measure air pressure. The air pressure forces measured by these devices may be converted into altitude and other relevant navigational data. The portals of N821TW's static and pitot tubes were located on the nose of the craft's fuselage. There were two sets or series of these tubes, one of which was connected to the Captain's instruments, while the other operated the First Officer's and flight recorder's instruments.

ed accurately the altitude at the time power ceased, that the crew's instruments performed properly at all times prior to the crash.

There is, of course, no way to categorically prove that the aircraft's instruments did not at some time during the approach exhibit erroneous information, as all of those persons who may have been able to testify directly as to that matter were fatally injured in the accident, nonetheless the inference that the instruments did operate properly is based on substantial fact, which has not nor cannot be disproved.

▮ TWA asserts, as to the argument that the flight recorder operated correctly therefore the First Officer's instruments, which received the same data, must have also functioned correctly, that the flight instrument recorder did not register the aircraft's actual situation. It is alleged that the flight profile depicted by the flight instrument recorder read-out could not have possibly taken place; that such a flight profile would have been physically impossible for a Convair 880 jet aircraft to fly. Certainly it would be impossible for a Convair 880 to safely simulate the flight profile depicted by N821TW's flight recorder, however, the fact that N821TW's flight recorder depicted an unsafe flight pattern would in light of the tragic termination of N821TW's flight, seem to buttress the conclusion that the recorder did not malfunction.

In an effort to create a question of fact regarding the proper operation of the aircraft's instruments, TWA contends that the amount of precipitation in the air at the time of the accident and the icing propensities of this precipitation at the aircraft's altitude prior to the accident might have caused the pitot and static pressure tubes to convey erroneous information to the Captain's and First Officer's instruments. If this were the case the crew members may not have known their actual situation, and may not, therefore, be charged with having responded to their circumstances

(i. e. what they believed to be their circumstances) in a negligent or unreasonable manner. It is generally admitted by the parties that water or ice ingestion at the portals of the pitot and static tubes, were such a thing possible, could cause erroneous instrument readings. TWA argues that the design of the static lines attached to the static ports was such that upon descent of the aircraft enough water could have been absorbed by the system to cause significant deviations on the crew's navigational instruments.

The postulation that the instruments malfunctioned because of trapped water in the static lines is totally hypothetical, is based on double and triple inferences and is not, in the opinion of the court, sufficient to raise a question of fact. Mere supposition will not overcome a motion for summary judgment. There has been no evidence produced to the effect that the navigational systems of N821TW or Convair 880's ever had any history of malfunction in meterological conditions similar to those which prevailed at the time of the accident. There has been no evidence introduced which would affirmatively prove that water was in fact absorbed by the static lines, or if it was, that it caused the crew's altimeters and other instruments to "lag" or report incorrect information. There is simply no evidence, other than strained inferences, that the crew of N821TW was in any way deceived or misguided by their navigational instruments.

▮ ▮ A designer or manufacturer of a product may not be held liable for negligence unless there is proof that, at the time of the accident, a defect in that product existed which was the proximate cause of the harm. Barbeau v. Roddy Manufacturing Co., 431 F.2d 989 (6 Cir. 1970). There is no evidence that the navigational instruments aboard N821TW, designed, manufactured and assembled by Kollsman and General Dynamics, were defective. In view of the fact that there is no affirmative evidence that the instruments were defec-

tive, nor is there any evidence that the instruments had any history of malfunction, it cannot be presumed, simply because there was an accident, that they did not work properly. Briner v. General Motors Corp., 461 S.W.2d 99 (Ky. 1970). It is the judgment of the court that the evidence presented and the stipulated facts lead to the inescapable conclusion that the various navigational instruments manufactured, assembled or installed by General Dynamics and Kollsman did not malfunction, were not defective and were not the proximate cause of the accident. Kollsman Instrument Corporation and General Dynamics Corporation are, as a matter of law, entitled to summary judgments.

## UNITED STATES' MOTION FOR SUMMARY JUDGMENT

It is generally accepted that the negligence of a defendant must be the proximate cause of an accident before liability may attach to that defendant. Riley v. Burgess, 410 S.W.2d 712 (Ky.1967). The United States contends that the sole proximate cause of the accident was the legal and factual negligence of the aircraft's crew, and that it, therefore, cannot be held responsible. It is asserted that the crew did not follow the procedures set out in the Federal Aviation Regulations for visual approaches; that no minimum level altitude callouts were made by the First Officer as required by the Regulations; that the crew permitted their aircraft to descend below the specified minimum level altitude for runway 18 of the Greater Cincinnati Airport without having made an actual visual sighting of the runway; that no missed approach was executed by the crew as required by the Regulations; and that the crew failed to heed and utilize the navigational data available to them. The United States further contends that its tower Controllers and Dispatchers were not negligent, that they performed every duty that they were required by law to perform, and that re-

gardless of their behavior or action, they cannot as a matter of law be held liable for the crash.

 The primary duty of tower Controllers is to prevent inflight aircraft collisions. In addition to marshalling the location of aircrafts and determining landing priorities, Controllers must inform pilots of weather conditions and airport facilities, but the burden of determining whether an aircraft should or should not land must ultimately be borne by the pilots and crew members. Section 91.3 of 14 Code of Federal Regulations states that: "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." This would necessarily mean that the pilot is directly and principally responsible for the landing of his aircraft. The fact that the tower Controllers of the Greater Cincinnati Airport cleared N821TW for landing did not shift the responsibility for a safe landing to them. United States v. Miller, 303 F.2d 703 (9 Cir., 1962); and New York Airways, Inc. v. United States, 283 F.2d 496 (2 Cir., 1960).

 The tower Controllers informed the crew of N821TW of the prevailing weather conditions and informed them of the limited navigational aids functioning on runway 18. The crew, fully aware of the rather precarious weather conditions and runway circumstances then existing at the Greater Cincinnati Airport, nevertheless chose to attempt to land. If the weather conditions had ameliorated, and if certain of the lighting systems and other navigational aids of runway 18 had been functioning the accident may not have occurred, but the hazardous conditions existing at the time of the accident do not necessarily reflect upon the reasonableness of the Controller's actions, as those conditions did not expand or broaden their statutory duties. It is the judgment of this court, based on the stipulated facts submitted by the parties, that

the United States was not negligent and that it cannot, as a matter of law, be held liable.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

■ The undisputed facts clearly establish that the crew members of N821TW were remiss in the performance of their duties, and that their negligence was the proximate cause of the accident. There being no genuine issue as to any material fact regarding the liability of TWA, it is the judgment of this court that the plaintiffs are entitled, as a matter of law, to a summary judgment.

The crew's negligence can be traced to their failure to perform two fundamental and highly important functions. The First Officer of N821TW failed to make the necessary callouts in reference to the aircraft's sink rate (i. e. rate of descent), the aircraft's rate of speed, and most importantly, the aircraft's altitude. These audible instrument checks should have been made at various instances during the approach and landing procedures. The voice record tape indicates that the First Officer at no time made any reference or callout as to the aircraft's actual altitude, except immediately before the accident. In making quasi-instrument approaches, as N821TW attempted to do, pilots are required to make a visual sighting of the runway before descending past the prescribed minimum altitude for that particular airport. Such a procedure is to insure that a ground landing may be made strictly from visual reference outside of the aircraft without the aid of electronic or mechanical navigational devices. If an aircraft descends to its minimum altitude for a visual approach and fails to sight the runway then it is required to execute a "missed approach", which simply means that the aircraft is to ascend to a specified altitude and await instructions from the tower. As stated above, the first negligent act of the crew was the First Officer's failure to call out the minimum altitude when it was reached. The second negligent act of the crew was their failure to execute a missed approach when they reached the minimum altitude of 1,290 feet mean sea level without being able to see the runway. The TWA Operations Policy Manual and Flight Handbook explicitly states that the First Officer is required to make field elevation and altitude callouts. The manual also states that below 500 feet above the field the First Officer is obligated to call out each 100 feet change until minimums are reached, whereupon the First Officer is required to call out "minimums—no runway" if the runway or visual indications of it have not been sighted. The crew of N821TW failed to make the proper call outs, failed to utilize the navigational data available to them, and failed to execute a missed approach when it became apparent, or should have become apparent, that they had reached their minimum altitude without having seen or being able to see the runway. The crew knew or should have known of the aircraft's excessive airspeed, excessive rate of descent, and excessive low altitude, and should have acted to rectify their dangerous situation. In failing to take whatever remedial action was necessary the court is satisfied that the crew was negligent and that their negligence was the proximate cause of the accident. TWA has argued that the crew did not know of their situation and could not have possibly known of it because of instrument malfunction. As this court has heretofore stated, there has been no evidence submitted which would affirmatively prove that the instruments failed to work properly. What little affirmative and direct evidence there is leads only to the conclusion that the instruments accurately indicated the aircraft's altitude, rate of descent, and speed at all times prior to the crash.

The court is well aware and mindful of the often quoted judicial admonition that summary judgment is an inap-

propriate approach to the negligence cases. Moreover the court concurs in the reasons and principles upon which that admonition is founded. The resolution of tort issues most generally requires an application of the reasonable man standard on questions of fact, and out of considerations of fairness and justice it is believed that plaintiffs as well as defendants should be entitled to a jury trial on all issues involving an application of that standard. The facts of this case, however, are such that there is no legitimate question of fact which should be submitted to a jury. Where there is no question of fact and where a jury trial would only be superfluous summary judgment is a proper remedy. See Marsden v. Patane, 380 F.2d 489 (5 Cir., 1967).

TWA has attempted to raise a question of fact as to the proper operation of the aircraft's instruments. The court feels that the assertion of that contention, under the particular facts of this case, is specious if not spurious. Clearly, if the instruments did not fail there is a prima facie showing that the crew was negligent and that their negligence was the sole cause of the accident. If, on the other hand, the instruments did not work accurately, then it may well have been that the crew acted in a reasonable manner. It can always be argued that there was some intervening factor which proximately caused an accident, but before that factor can be considered there must be some affirmative proof as to its existence. There having been no credible or affirmative evidence adduced as to instrument malfunction, this court is disposed to grant the various motions for summary judgment discussed in this memorandum. An order will this day be entered sustaining the United States', General Dynamics Corporation's and Kollsman Instrument Corporation's motions for summary judgment dismissing the complaints and claims against them. An order will also be entered granting the plaintiffs' motion for summary judgment against Trans World Airlines, Inc. on the question of liability.