J. Bruce MILLER, Admr. Estate of Jerry L. Roades, Plaintiff,

v.

UNITED STATES of America, Defendant.

J. Bruce MILLER, Admr. Estate of Jerry Lee Roades, Plaintiff,

v.

UNITED STATES of America, Defendant.

J. Bruce MILLER, Admr. Estate of Barbara Posthumus, Plaintiff,

v.

UNITED STATES of America, Defendant.

J. Bruce MILLER, Admr. Estate of Charles L. Cochran, Plaintiff,

v.

UNITED STATES of America, Defendant.

J. Bruce MILLER, Admr. Estate of Robert P. Moyers, Plaintiff,

v.

UNITED STATES of America, Defendant.

Sheila O'Brien SWAINBANK, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 1398, 1400 and 1504–1507.

United States District Court,
E. D. Kentucky,
Covington Division.

Aug. 1, 1974.

Thomas C. Carroll, Louisville, Ky., for plaintiffs.

Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., for defendant.

MEMORANDUM

SWINFORD, District Judge.

On November 20, 1967, Trans World Airlines (hereinafter: TWA) Flight 128 crashed during its landing approach at the Greater Cincinnati Airport at Covington, Kentucky. Five of the seven crew members and sixty-five of the seventy-five passengers sustained fatal injuries in the accident. The passengers and their estates filed numerous suits against TWA, General Dynamics (the manufacturer of the aircraft) and Kollsman Instrument Company (the fabricator of certain instruments used in the plane), while the crew sued the United States for negligence on the part of the Federal Aviation Agency (hereinafter: FAA) in controlling the landing of Flight 128. The litigation was consolidated in this court pursuant to the Multidistrict Litigation Act, 28 U.S.C. § 1407, and the parties engaged in extensive discovery. On June 18, 1971, the court granted summary judgment against TWA, but dismissed the claims against General Dynamics, Kollsman and the United States. Reidinger v. Trans World Airlines, Inc., E.D.Ky., 329 F. Supp. 487 (1971). The Court of Appeals reversed and remanded for trial in an opinion concluding that summary judgment was precluded by the existence of factual issues. Reidinger v. Trans World Airlines, Inc., 6th Cir., 463 F.2d 1017 (1972). An order entered on August 24, 1972, advised the Judicial Panel on Multidistrict Litigation that pretrial discovery had been completed and the cases were ready for return to their courts of origin. On September 10 and 11, 1973, trial was held in the suits by the crew against the United States, the only actions remaining in this district. The parties have been accorded an opportunity for the submission of briefs and the record is before the court for decision.

Despite the mass of technical evidence obtained in this action, most of the operative facts are uncontroverted and easily summarized. On November 20, 1967, a Convair 880 turbo-jet aircraft departed Los Angeles as Flight 128 to Boston, Massachusetts, with intermediate stops at Cincinnati, Ohio, and Pittsburgh, Pennsylvania. The Cincinnati airport at the time of the accident maintained two runways capable of handling a Convair 880: the North-South Runway 18–36, and Runway 27–9, in an East-West configuration. Flight 128 arrived in the Cincinnati area in the Northwest and eventually proceeded south for an "instrument"[1] landing on Runway 18. On its approach, the aircraft crashed into trees on the South side of the Ohio River at an altitude fifteen feet below the airport field elevation, and 9,357 feet short of the approach end of Runway 18. The plaintiffs contend that the accident resulted from negligence on the part of FAA ground officials while the United States argues that pilot error or instrument failure caused the crash.

Liability on the part of the United States is predicated on the Federal Tort Claims Act:

"(T)he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

The plaintiffs initially attack not an individual employee but the FAA for inadequate air safety regulations and its failure to supervise airport landing procedures. This "cavalier" administrative attitude was reflected in the negligence of ground control officials in supervising

---

1. While "Visual Flight Rules" apply in fair weather operations, conditions of diminished visibility dictate an "IFR" approach, utilizing various navigational aids on runways equipped with an "Instrument Landing System" (ILS). See 14 CFR 91.105, 91.116, 121.567.

the approach of Flight 128. First, Cincinnati FAA officers neither ascertained nor transmitted the correct meteorological data to the aircraft. While originally reported at 6 miles, a subsequent ground observation reduced visibility to 1½ miles. This figure, however, was incorrectly obtained through the use of a visual reference point only ½ mile from the observer; the error of the reported visibility is further reflected by testimony on the part of surviving crew members and lay observers that they could not see beyond a few hundred feet at the time of the crash. The inaccurate FAA determination was compounded by the failure to adequately advise Flight 128 of the worsening weather. Second, Cincinnati tower authorities failed to direct Flight 128 to a Runway 36 approach which would have enabled both milder weather conditions and superior navigational aids. Third, FAA officials should have activated the "glide slope"[2], despite a .05° error discovered several days before the crash[3]; the employment of this navigational aid would have prevented the tragedy.

It is initially apparent that the plaintiffs' criticism of the FAA is not judicially cognizable. The Federal Tort Claims Act does not apply to

"(a)ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

This section is intended to insulate the rule-making functions of the administrative branches. See Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Hendry v. United States, 2d Cir., 418 F.2d 774, 782 (1969). While negligence on the "operational level" is not embraced by the statutory exception[4], tort liability will not be imposed for the failure to promulgate rules deemed necessary by a private litigant.[5] Thus, several courts have specifically held that the United States may not be subjected to liability arising from the absence of stricter air safety regulations:

"The establishment of requirements for pilots and aircrafts and of methods for determining whether those requirements have been met, and the providing of landing systems and communication and weather information facilities, are discretionary functions of government." Marr v. United States, E.D.Okl., 307 F.Supp. 930, 931 (1969).

Accord, Kullberg v. United States, W.D. Pa., 271 F.Supp. 788, 799 (1964); Rowe v. United States, W.D.Pa., 272 F.Supp. 462, 471 (1964); Braniff Airways, Inc. v. United States, S.D.Fla., 203 F.Supp. 602, 606 (1961), aff'd 5th Cir., 315 F.2d 631 (1963).

The court's survey of the record similarly fails to disclose any actionable

---

2. The "glide slope" is a ground instrument generating a radio signal which supplies vertical guidance along the correct descent angle to the proper runway landing point.

3. On November 15, 1967, an FAA test plane discovered the error but was unable to correct the divergence to within limits acceptable to the agency.

4. See United States v. Furumizio, 9th Cir., 381 F.2d 965, 968 (1967); Murray v. United States, D.Utah, 327 F.Supp. 835 (1971), amended and aff'd 10th Cir., 463 F.2d 208

(1972); Motors Insurance Corp. v. Aviation Specialties, Inc., W.D.Mich., 304 F.Supp. 973 (1969); Hunter v. United States, M.D. Tenn., 236 F.Supp. 411 (1964); McNamara v. United States, D.C., 199 F.Supp. 879 (1961).

5. Weinstein v. United States, 3d Cir., 244 F.2d 68 (1957), cert. denied 355 U.S. 868, 78 S.Ct. 116, 2 L.Ed.2d 74 (1957); see also Dalehite v. United States, supra; Blaber v. United States, 2d Cir., 332 F.2d 629 (1964).

negligence on the part of individual FAA officials. While the weather on November 20, 1967, was undoubtedly poor, there is no evidence substantiating the contention that visibility was improperly deduced at 1½ miles. Rather, it is apparent that the observations were consistent with accepted standards governing such a determination. Plaintiff's Exhibit No. 72. The assertion that a visibility figure of 1½ miles is not ascertainable by a visual reference point only ½ mile away was rebutted by testimony supporting the propriety of an assessment by consideration of the brilliance or clarity of the closer object. Deposition of Dennie R. Story (hereinafter: Story Dep.), pp. 53–56, 61–63. Further, the accuracy of the reported figure was confirmed by several other observers, Story Dep., pp. 86, 98–99; Deposition of Philip B. Neff, and buttressed by a "Runway Visual Range" (RVR)[6] of 6,000 feet. Plaintiff's Exhibit No. 24, page 27. A conclusion that visibility was less than 1¼ miles would not have been sufficient to negate the RVR figure since that instrument is capable of more sophisticated measurements than those visually available.[7]

It is further apparent that Flight 128 was properly informed of prevailing meteorological conditions. The cockpit voice recorder reveals the following transmission concerning local weather:

"The wind is one two zero degrees at six. ILS Runway one eight approach is in use . . . This is Greater Cincinnati Airport information Kubeck. Weather six hundred scattered, estimated ceiling six thousand overcast,

visibility six miles, haze." Plaintiff's Exhibit 24, page 16.

The flight was subsequently advised that visibility had diminished to 1½ miles with snow and haze. Plaintff's Exhibit 24, page 22. The crew's awareness of prevailing weather was reflected by the return transmission stating, "Hey, it's snowing up here, too." Plaintiff's Exhibit 24, page 23.

The decision not to divert Flight 128 to Runway 36 was legally unassailable. Although a complete "Instrument Landing System"[8] was not in operation on Runway 18, sufficient navigational aids existed for a "nonprecision instrument approach." See 14 CFR 1.1. It is evident that Richard L. Hellmann, the FAA watch supervisor, considered the relative capabilities of Runways 18 and 36 in terms of available instrumentation: Runway 18 provided an outer marker, outer compass locater, localizer[9], and high intensity runway lights, but construction work rendered the approach lights, middle marker, and glide slope nonoperational. While the approach lights and middle marker were functional on Runway 36, the glide slope and localizer[10] were not. See Hellmann Dep. Whatever the current speculation concerning the wisdom of diverting the aircraft, it remains apparent that the available aids rendered a Runway 18 procedure a nonemergency "Localizer" approach which the crew was trained to undertake. See Deposition of John F. Rhodes (hereinafter: Rhodes Dep.), pp. 103, 111–112; Deposition of Harvest B. Mitchell, p. 87; Deposition of James Edward Frankum (hereinafter: Frank-

---

6. "Runway Visual Range" is obtained through an electronic measurement of visibility along a runway. The 6,000 feet figure, which is the maximum attainable by this device, corresponds to 1¼ miles visibility. 14 CFR 91.-116(e).

7. 14 CFR 121.655 requires pilots to adhere to the RVR value in the event of a discrepancy with visual observations.

8. Such a system includes approach and runway lights, outer marker, middle marker, localizer, glide slope, and outer compass locater.

9. These devices assist in aligning the aircraft and runway.

10. Although the Runway 18 localizer could be utilized on Runway 36, such an implementation would apparently result in considerable inaccuracy. Deposition of Richard L. Hellmann (hereinafter: Hellmann Dep.), p. 78.

um Dep.), pp. 137–138; Deposition of Alfred C. Denning, p. 15. Informed of the conditions surrounding the use of Runway 18, the pilot as the final authority over runway choice[11] at no time requested a diversion to another approach. Further, the evidence tends to contradict the plaintiffs' argument that the weather favored Runway 36: (1) radar-scopes suggested the likelihood of more severe weather in an alternate approach; (2) an earlier departing aircraft reported heavy snow upon leaving Runway 36, Deposition of Harry A. Beecham (hereinafter: Beecham Dep.), pp. 23–24, 48, 52; (3) the wind variations occurring during the day favored a landing on Runway 18.[12]

The contention that the glide slope should have been activated is similarly groundless. While the plaintiffs may be correct in arguing that Flight 128 would have been airborne over the crash site if the instrument had been activated, it remains apparent that the FAA Regulations preclude the operation of the device with an error of that magnitude. See Deposition of Scott B. Shockey.

The plaintiffs have also failed to establish a causal connection between the crash and the meteorological data or runway choice. See Illinois Central Railroad v. Vincent, Ky., 412 S.W.2d 874 (1967); Gerebenics v. Gaillard, Ky., 338 S.W.2d 216, 219 (1960); Morris v. Combs' Adm'r, 304 Ky. 187, 191, 200 S.W.2d 281 (1947). The causative chain involved in the case at bar is unlike that presented in Ingham v. Eastern Air Lines, Inc., 2d Cir., 373 F.2d 227 (1967), cert. denied 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967), where the pilot was not advised of diminished visibility; Gill v. United States, 5th Cir., 429 F.2d 1072 (1970), where the crash was attributable to the transmission of incorrect weather information; United States v. Furumizio, supra, which affirmed a jury finding of causation between a crash and the controller's failure to warn a private pilot of unknown hazards; or Stork v. United States, S.D.Cal., 278 F.Supp. 869 (1967), aff'd 9th Cir., 430 F.2d 1104 (1970), where the crash was caused by the failure of the control tower to advise a pilot that his anticipated departure contravened regulations.

An examination of the record leaves scant doubt that the crew's compliance with minimum outlined safety standards would have averted the crash. While the success of an instrument approach is partially dependent upon the air traffic controller, the crew is charged with observing certain precautionary standards. Thus, the pilot must maintain the "minimum descent altitude" established for the landing involved; this term denotes the minimum altitude to which the aircraft may descend without sighting the runway or another visual reference. 14 CFR 91.117(b). The minimum descent altitude for a Runway 18 landing is 1,290 feet above sea level, or 400 feet above the airport elevation. U. S. Exhibit C. The aircraft's impact several hundred feet *below* the minimum descent altitude clearly establishes a violation of this safeguard. Frankum Dep., pp. 138–139; Beecham Dep., pp. 32, 50–51. It is similarly apparent that the crew did not follow TWA crew coordination procedures designed to maintain "altitude awareness." These regulations contemplate (1) altitude call-out by a crew member when the aircraft is 500 feet above airport elevation; (2) when the minimum descent altitude is reached, a crewman must call-out "runway in sight" or "minimums—no runway", if no visual

---

11. 14 CFR 91.3 provides that the pilot "is directly responsible for, and is the final authority as to, the operation of that aircraft."

12. The wind at the time of the crash was from the East at 90° to runway 18/36; however, the direction was constantly shifting and at one point would have rendered a Runway 36 landing a more critical "downwind" approach. Hellmann Dep., pp. 83, 85–90, 93, 123.

reference is located; (3) verbalizations of airspeed and rate of descent. Plaintiff's Exhibit 3; U. S. Exhibits A, E; Rhodes Dep., pp. 52–56. The cockpit voice recorder reveals no call-out of altitude, speed, or rate of descent.

The conclusion that the crash was attributable to the crew's failure to detect the aircraft's excessively low altitude necessarily severs any causation flowing from the conduct of FAA officials. American Airlines, Inc. v. United States, 5th Cir., 418 F.2d 180, 193, 194 (1969), found that inaccurate visibility information transmitted by the Cincinnati control tower could not have contributed to the pilot's failure to maintain sufficient approach altitude:

> "It is not disputed that Flight 383, with no malfunction of aircraft or equipment, was allowed at a distance of two miles from the runway to descend 225 feet below the elevation of the point upon which it proposed to land. It necessarily follows that with properly functioning altimeters aboard, and in the absence of some external force beyond pilot control . . . ., permitting this aircraft to descend to such an altitude was the sole proximate cause of the crash:
>
> \* \* \* \* \* \*
>
> "There is no suggestion . . . that competent commercial airline pilots . . . cannot maintain altitude in clouds and rain. Visibility cannot have been a causative factor in a crash two miles from the end of the runway . . . where the pilots should have been maintaining an altitude of five hundred . . . feet above the runway. This was not a crash on the airfield . . . . These pilots were qualified for instrument flight and there is nothing to suggest that outside visibility affects the ability of a pilot to read his altimeter in a lighted cockpit."

See also Wenzel v. United States, 3d Cir., 419 F.2d 260 (1969).

The crash of Flight 128 may not have occurred had different decisions or natural conditions prevailed on November 20, 1967. However, it is not the function of this court to predicate liability upon the mere coalescence of otherwise proper events; "the hazardous conditions existing at the time of the accident do not necessarily reflect upon the reasonableness of the Controller(s') actions, as those conditions did not expand or broaden their statutory duties." Reidinger v. Trans World Airlines, Inc., 329 F.Supp. at 491. See also Bibler v. Young, 6th Cir., 492 F.2d 1351, 1353–1354 (1974). An examination of the voluminous record compiled during the four year history of this case yields no justification for the imposition of liability upon the United States.

A judgment in accordance with this opinion will this day be entered.