## Morris et al. v. Combs' Adm'r.

March 4, 1947.

Roy Helm, Judge.

Craft & Stanfill for appellants.

C. A. Noble for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

This appeal is from a $2000 judgment in favor of the appellee against John Morris, special policeman of the City of Hazard, and the Standard Accident Insurance Company which signed the bond for the policeman. The amount of the bond was $2000—this fact was known to the jury. The basis of the suit was that the actions

of the officer caused the death of Kenneth Combs, age 9, in 1940.

Several grounds are urged for reversal, the first being that a peremptory instruction should have been given in favor of the appellants at the conclusion of the evidence offered by the appellee. Since we have reached the conclusion that this position is well taken, we shall confine our consideration of the case solely to that point.

In his opening statement to the jury, and in his brief, counsel for the appellee took the position that Kenneth's death was brought about by the officer driving his automobile over the boy's body and thereby crushing his skull. The proof utterly fails to show that this happened. No witness testified that he saw the car pass over the boy's body. It is true that his body was found lying in the middle of the road after the car in which he was riding on the back seat collided with another car. In all probability his skull was crushed when he was thrown from the car. The officer and a colored boy who was riding in the front seat of his car testified that the car was not driven over the boy's body. There was no testimony as to tire marks on the boy's body, or as to any bloodstains on the tires of the officer's car. Elishamar Noble, who was sitting on the back seat of the officer's car, said it was traveling at a rate of about 40 miles an hour when it went between the wrecked cars, but when asked if he saw the boy's body, he answered, "No." Certainly there would have been a bump or jar if the car had passed over the child's body, but Noble was not asked if he felt any such sensation. With this background in mind we shall briefly review the facts leading up to the time of the collision just mentioned with the view of ascertaining whether or not any acts on the part of the officer can be said to have been the proximate cause of the boy's death.

On the day Kenneth met his death in 1940 he and a brother went with his father, Matt Combs, Clarence Turner and Hargis Watts from their home on Carrs Fork in Perry County to Breathitt County for the purpose of delivering some hogs. The hogs were hauled in a trailer attached to a Ford automobile owned by Matt Combs. On the return trip Watts was driving the car. He admitted having taken one drink before he ate his supper,

but there is testimony relative to his actions before he reached Hazard which would indicate that he had had more than one drink, or at least he had taken a sizable one, because he deliberately drove the car through a closed toll gate. South of Hazard, Watts picked up Elishamar and Foch Noble. These boys rode in the trailer. Both of them were drunk. When Watts reached the intersection of High and East Main Streets in Hazard he stopped the car and the Noble boys got out of the trailer. About the time the boys got out of the trailer John Morris drove up in a police car. He told the boys to get in his car, which they did. A colored boy came to the police car and got in the front seat.

A summary of the appellants' testimony follows: Morris said he saw a man, who turned out to be Watts, get out of the car and stagger around it and take hold of the trailer. Presuming that Watts was drunk Morris started his car in the direction of Combs's car. Upon seeing the police car coming toward him Watts jumped in the car and pulled away at a rapid rate of speed. Before reaching the city limits Morris began sounding the siren on his car and Watts increased his speed. When they reached the Glomawr bridge about four miles from Hazard, Morris fired his pistol in the air six times in an effort to halt Watts. Instead of stopping, Watts increased his speed to approximately 70 miles an hour, which he admitted. When Watts reached the vicinity of Jeff, about eight or nine miles from Hazard, he met a car coming toward Hazard at a high rate of speed on the wrong side of the road and the collision resulted. Shortly before the collision the trailer came loose from Watts' car and ran off the side of the road, but he made no effort to stop and get it. When Morris reached the scene of the collision he drove his car between the two wrecked cars and after going down the road a short distance he turned around and came back to the scene of the collision. Upon seeing the condition of the occupants of the two cars he went to Jeff to telephone for aid. Morris and other officers said they found a broken fruit jar in or near the Combs car which had had moonshine whisky in it.

As a result of the collision Kenneth was thrown from his father's car, Watts and Matt Combs were

knocked unconscious, two of the persons in the other car were killed and several others injured.

The testimony for the appellee may be summarized as follows: Watts said he got out of his car in Hazard and went around to the trailer to ask the Noble boys to go home with him. When they refused to do so he got back in the car and started home. When he reached Lothair, a short distance from Hazard, he heard the siren of a car and pulled over to his extreme right, but did not stop. When he reached the Glomawr bridge he heard a number of shots fired in his direction and becoming frightened he picked up his speed and continued on toward his home. The car following him remained in close pursuit and some 25 to 30 shots were fired. When he had gone about eight or nine miles he saw an approaching car some 100 feet away traveling on his side of the road at a rapid rate of speed and his car and the other car collided. He was knocked unconscious. The testimony of Matt Combs is substantially the same as that of Watts.

Watts admitted he heard the siren of what he termed ''the officer's car'' and that he kept driving, thinking the officer would stop at Lothair. He said he intended to stop at the Glomawr bridge, but when the shooting started he became frightened because he did not know what might happen. He admitted also that he knew when a siren blew he should stop no matter where he was. But he attempted to excuse his actions on the ground that he had not violated any law and was outside the city limits. We have noted also that he said he was traveling at the rate of approximately 70 miles an hour when the collision occurred. When asked the cause of the wreck his answer was, ''That was the cause of the wreck, he was on the wrong side of the road and hit the fender.'' He was referring to the approaching car which was being driven by a boy by the name of Draughn. In other parts of his testimony Watts attempted to place the blame for his actions on the officer, but we fail to see how it can be said that the actions of Morris brought about the collision.

There is nothing in the record to show that Morris was not acting in good faith. He had the right to make an arrest, without a warrant, of a person guilty of drunkenness or disorderly conduct in his presence, or whom he

had reasonable grounds to believe guilty of such conduct. Goins v. Hudson, 246 Ky. 517, 55 S. W. 2d 388; Giannini v. Garland, 296 Ky. 361, 177 S. W. 2d 133, and cases cited therein. There is testimony supporting his own to the effect that he thought Watts was drunk. Morris had the right to pursue Watts beyond the city limits of Hazard in an effort to make his arrest. Earle v. Latonia Agricultural Association, 127 Ky. 578, 106 S. W. 312. He blew his siren within the city limits and beyond them in an effort to stop Watts. He traveled some four miles before he fired his pistol. We see nothing particularly wrong in this action, since all other efforts to stop Watts had failed. While he said he fired only six shots, we have noted that the testimony on the other side is that 25 to 30 shots were fired. It seems hardly plausible that he could have fired more than one round of ammunition in view of the rapid rate of speed he was traveling, but even if he did the question is, Was the firing of the pistol the proximate cause of the accident? Watts said the cause of the collision was that the Draughn car was on the wrong side of the road.

But, even if it be conceded, which we do not, that it was wrong for the officer to fire his pistol after he had followed Watts's car some four miles from Hazard, can it be said that this act was responsible for a collision some four miles distant? In the case of Newton v. Wetherby's Adm'x, 287 Ky. 400, 153 S. W. 2d 947, 949, proximate cause was defined as follows: "* * * that which, in a natural and continual sequence, unbroken by any new, independent cause produces the injury, and without which the injury would not have occurred."

In our opinion the actions of Watts were the proximate cause of the accident. He was deliberately fleeing from an officer and was traveling at a terrific speed when the collision occurred.

For the reasons given we think the judgment should be and it is reversed, with directions to set it aside. If there be another trial and the evidence is the same, a peremptory instruction should go in favor of the appellants.