George W. **ROSENTHAL**, Executor, Estate of Marion R. Rosenthal, Plaintiff,

v.

**TRANS WORLD AIRLINES, INC.**, Defendant-Appellee,

v.

**DELTA AIR LINES, INC.**, Defendant-Appellant.

No. 72–2211.

United States Court of Appeals, Sixth Circuit.

Argued June 5, 1973.

Decided Jan. 17, 1974.

Edward D. Crocker, Cleveland, Ohio, for defendant-appellant; Arter & Hadden, Cleveland, Ohio, and John W. Beatty, Dinsmore, Shohl, Coats & Deupree, Cincinnati, Ohio, on brief.

Ralph F. Mitchell, Cincinnati, Ohio, for defendant-appellee; Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, and Paul G. Pennoyer, Jr., Chadbourne, Parke, Whiteside & Wolff, New York City, on brief.

Before WEICK and McCREE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

We consider the appeal of Delta Air Lines, Inc., (Delta) from a judgment entered upon a jury verdict awarding $2,216,000 to Trans World Airlines (TWA) and Federal Insurance Company (Federal) for damage done to a TWA Boeing 707 airplane in the casualty involved herein. The case was tried in the United States District Court for the Southern District of Ohio, Western Division.

At approximately 6:30 P.M., on November 6, 1967, a TWA aircraft (TWA) was commencing its takeoff at the Greater Cincinnati Airport in Boone County, Kentucky, its destination Los Angeles. A Delta aircraft (Delta) was standing close to, but off of, the north side of the runway being used by TWA. As it proceeded, TWA passed to the rear of Delta, at which time the TWA pilot mistakenly concluded that he had hit the Delta plane, and attempted to abort (terminate) his takeoff. The speed of TWA, however, had then become such that the attempted abort could not be accomplished. There had, in fact, been no contact between the TWA and the Delta planes, and the TWA takeoff could have been successfully accomplished notwithstanding the presence of the Delta plane near the runway. The TWA plane ran off the end of the runway and was severely damaged. The plaintiffs Rosenthal—passengers aboard the TWA plane—were injured.

This action was brought by Rosenthal, individually, and as executor of his wife's estate. These claims, however, have been disposed of and are not involved in this appeal, except as they are involved in a cross-claim of Delta against TWA for indemnity or contribution as to the Rosenthal recovery against Delta. We are concerned primarily with the claims of TWA–Federal against Delta. In that claim, appellee TWA charged that the Delta plane had negligently stopped near the runway upon which TWA was making its takeoff run; that such proximity of the Delta plane was the cause of the TWA pilot's belief that he had hit the Delta craft and the ultimate crash of the TWA plane. The complex procedure of the litigation is correctly summarized in appellant Delta's brief:

"Both the $105,000 judgment Rosenthal recovered against Delta as executor and the $45,000 judgment recovered by Rosenthal individually have been satisfied. That aspect of the cases is now closed.

"TWA cross-claimed against Delta and the United States seeking damages of $4,845,000 for loss of its 707 aircraft. Delta cross-claimed against TWA and filed a third-party claim against the United States asking indemnity or contribution for any amounts Delta might be required to pay—since Kentucky law which controls here provides for contribution among joint tort-feasors.

"On discovery it developed that TWA had been paid $4,728,750 by Federal on the hull loss. The District Court thereupon granted Delta's motion to compel joinder of Federal as a real party in interest allied with TWA.

"As thus aligned the case came on for trial before Judge Hogan and a jury on April 24, 1972. The Rosenthal claims against TWA and Delta and TWA-Federal's claim against Delta were tried to the jury. The claims of TWA and Delta against the United States under the Federal Tort Claims Act were tried to the court. Delta's claim against TWA for indemnification or contribution was reserved with the understanding that should the jury return a verdict in favor of the Rosenthals against both TWA and Delta, the question of Delta's right to indemnity or contribution would then be submitted to the jury for determination.

"The evidence adduced at trial by TWA-Federal showed that while Federal had paid TWA $4,728,750 on the hull loss, the actual value of the 707 plane at the time of its loss was only $2,316,000 against which salvage of $100,000 was allowed leaving a net loss of $2,216,000. Delta did not dispute that amount.

"After ten days of trial the case was submitted to the jury on May 10, 1972. On May 12, 1972 the jury returned its verdicts finding in favor of Rosenthal (as executor) against Delta in the amount of $105,000; in favor of Rosenthal (individually) against Delta in the amount of $45,000 and in favor of TWA-Federal against Delta in the amount of $2,216,000.

"On June 27, 1972 the district court entered judgment on the verdicts; entered judgment in favor of TWA on Delta's cross-claim and entered judgment in favor of the United States on the cross-claim of TWA and the third-party claim of Delta.

"Delta has elected not to appeal the judgment in favor of the United States on Delta's third-party complaint and hence the Government is not a party to this appeal.

"The only issues on this appeal are those between TWA-Federal on the one hand, and Delta on the other. With respect to the $2,216,000 judgment against Delta in favor of TWA-Federal, the questions are whether Delta is entitled to judgment n. o. v. or in the alternative a new trial, and whether Delta is entitled to a new trial on its cross-claim against TWA which was not submitted to the jury because of the nature of the verdicts returned."

The questions presented for review are:

1. Whether the District Court erred in failing to enter judgment for Delta on its motion for a directed verdict on the grounds (a) there was no evidence that negligence of Delta proximately caused the crash and (b)

TWA's evidence established conclusively that its own negligence contributed to cause the crash and that TWA's pilots were aware of the presence and position of Delta's plane and assumed the risk.

2. Whether the District Court erred in failing to grant Delta's motion for new trial for error in (a) refusing to let Delta's expert witness state his opinions concerning the cause of the crash and other related matters and (b) permitting counsel for TWA-Federal to argue outside the record and invite the jury to base its verdict on conjecture.

3. Whether the District Court erred in failing to grant Delta a new trial on its cross-claim against TWA.

We reverse and direct entry of judgment for defendant Delta, dismissing the cross-complaints of TWA, and Federal Insurance Company.

We so rule for these reasons: the conduct of the Delta crew, if negligent, was not a proximate cause of the accident; negligence or erroneous conduct of the TWA crew intervened to eliminate any negligence of the Delta crew as a proximate cause of the casualty involved; and the evidence established, as a matter of law, that negligence of the TWA crew was a contributory cause of the accident.

The runways upon, or adjacent to, which the controlling events occurred were identified as 27L and 18-36. Runway 27L, an active main runway at the time, ran from east to west a distance of 7,800 feet. It was 150 feet wide, paved and with high intensity lights off of, but immediately adjacent to the runway's pavement. Such lights were set at medium intensity on November 6. The TWA plane had a wing spread of 130 feet so that there would be 10 feet clearance on either side of the plane if it were travelling in the exact center of runway 27L. At a point slightly better than halfway from the east end of runway 27L, such runway was intersected by a north-south runway designated 18-36 which, at the time was unlighted,

not in regular use, and under repair; it was, however, usable as a means of exit to the north from runway 27L. The Delta plane had made a landing on 27L, and its captain was intending to use 18-36 as a means of clearing 27L for use for landing or takeoff by other planes.

The Delta plane—Flight 379—was a DC-9 two-engine jet aircraft, with its engines mounted in the tail. The TWA plane—Flight 159—was a Boeing 707 four-engine jet aircraft, with its engines mounted on the wings.

At approximately 6:38 P.M., Delta 379 landed on the east end of 27L and proceeded on that runway to the intersection of runway 18-36, where it intended to leave runway 27L. Advised that another plane was about to take off from east to west on 27L, the Delta crew requested permission from the control tower to make a 180° turn preparatory to exiting onto runway 18-36. Such a turn, the equivalent of a "U turn," was necessary to prepare to leave runway 27L because Delta had rolled slightly west of 18-36 (approximately half the airplane was past 18-36).[1] The tower granted permission to make the turn, and Delta proceeded to turn the craft to the right (west to north) until its nose wheel was a short distance from the north edge of 27L. The Delta captain stopped the craft at that point in order to ascertain the distance of the nose wheel from the runway edge. He could not see the wheel (which was under the cockpit), but did estimate the distance between it and the runway to be sufficient to allow him to complete his 180° turn. Power was again applied, but instead of turning, the nose wheel locked in a 90° position and the craft moved in a northerly direction off runway 27L. The Delta captain continued to apply power until the craft came to a complete stop on the north side of runway 27L, its nose wheel imbedded in mud adjacent to the runway. The Delta plane was entirely clear of runway 27L at this time. Delta's engines were then shut down to idle, and they remained so until after TWA had passed the rear of the Delta plane.

While Delta was attempting its turn, TWA 159 was waiting to take off at the east end of 27L. At 6:38:16,[2] TWA was cleared to position and told to hold on 27L. Neither TWA pilot saw the Delta craft on 27L at this time. At 6:39:24, TWA was cleared for takeoff.

Seconds before the TWA takeoff, the airport control tower spotted Delta at the 18-36 and 27L intersection and noticed that it had stopped moving. He asked, "Delta three seventy nine, you're clear of the runway aren't you?" to which the Delta first officer replied, "Yeah, we're in the dirt though." Such communication as to Delta's position was received on the radio in the TWA cockpit. The following portrays the TWA captain's knowledge on the subject.

"Q. Well, would a communication between an aircraft and the tower, which aircraft is either clearing, or in the process of clearing the runway or which you expect to take off, would that be a communication that you would consider applies to you? A. Yes.

"Q. Well, you wouldn't filter out that kind of a communication, would you? A. Well, I recognized that he reported clear of the runway and that was all the information I needed.

"Q. Well, we will get to that in a moment, I assure you, but we haven't got there yet and right now we are just talking about Delta 379's request to make a 180 degree turn while he

1. Although 18-36 was then under repair, it was usable as a taxiway to the airport terminal.

2. The time sequence of events here involved was established by the evidence at trial. Representatives of the National Transportation Safety Board were able to correlate the transmissions recorded on both aircrafts' cockpit voice recorders with the aircrafts' flight data recorders. From this information, it could be determined, with some uncritical margin of error, the relevant speeds and distances.

was still on the runway, and the tower's authorizing him to make a 180 degree turn to clear the runway; whether you heard that, that is what I want to know? A. I think I must have.

"Q. And then coming now to the point which you have just been discussing, you did hear, did you, the request from the tower to Delta 379 asking him, 'Delta 379, you are clear of the runway, aren't you?' Or words to that effect? A. Yes, I heard that.

"Q. And did you hear Delta 379 reply, 'Yeah, Delta 379, yeah, we're in the dirt though,' or words to that effect? A. I did, but as I have said twice, what I got out of that was that he was 'clear of the runway,' I didn't get that dirt business at all. ·

"Q. And immediately after that communication from Delta 379 to the tower, the tower called your aircraft, is that right? A. Yes.

＊　　＊　　＊　　＊　　＊　　＊

"Q. Well, without regard to what the particular words were, the tower gave you the information that 'he's clear of the runway,' is that right? A. Yes.

"Q. And you understood by that he was referring to Delta 379, not some other plane, is that right? A. Yes.

"Q. And then the tower went on to say that you were cleared for takeoff, is that right? A. Yes."

The Delta craft was in fact physically off the runway when the tower requested its position. Approximately seven feet separated the nearest part of the Delta plane and the runway edge. The construction of the Delta and the TWA planes was respectively such that at this distance the nearest part of the Delta plane which could be an obstruction to the passing TWA plane was 30 feet. However, when the Delta crew made its determination, neither Delta pilot was certain of the exact distance between its tail and the runway. When asked of the craft's position, the first officer, sitting in the right cockpit seat, turned to his side window and, using the runway lights as a standard, saw that the Delta plane was north of these lights, thus off the runway.

After TWA was told that the runway was clear, and that another aircraft was on final approach to land, TWA 159 proceeded to take off. The first officer, Ronald Reichardt, was piloting the flight, leaving the captain, Volney Matheny, with the co-pilot's duties. However, until the craft reached a speed of 80 knots, the captain controlled the steering of the craft with a nose wheel steering wheel. At the speed of 80 knots, he would call out this speed and thereafter the first officer would control the steering with the rudder pedals. This procedure was followed on TWA Flight 159.

In addition to calling out the 80 knot speed, it was also the co-pilot's duty—Captain Matheny on this flight—to call out various critical speeds in addition to 80 knots. The purpose of this procedure was to enable the pilot to give his complete attention to the runway, while the co-pilot attended the instrument panel. The first of these critical speeds to be called is "V1", known as the decision speed, or the last speed at which the craft can successfully stop within the confines of the runway. The second speed, "Vr", is the rotation speed, where the pilot rotates the craft by pulling back on the control wheel, thus elevating the nose to become airborne. On this particular flight, TWA's V1 speed was computed to be 132 knots, and Vr was 140 knots.[3] It was undisputed that the TWA captain failed to call out these relevant speeds, and the evidence showed that TWA had reached and was exceed-

---

3. A knot is defined as, "[a] unit of speed, equivalent to one nautical mile, or 6,080.20 feet, an hour." *Webster's New Int'l Dictionary* 1372 (2d ed. 1959). By using the formula of 1 knot equals 1.151 miles, 132 knots is translated into 151.93 miles per hour (or 223 feet per second), and 140 knots is equal to 161.14 miles per hour (or 236 feet per second).

ing the V1 speed before it passed to the rear of Delta.

TWA's captain and first officer made a conscious observation of the position of the Delta plane when they were 1,200 to 1,400 feet from it. As they had been advised, it was north of and clear of runway 27L. When they saw it, the TWA captain remarked, "Not very damn far off the runway," and his first officer rejoined, "Sure as hell isn't." Both of these officers testified from their own observations that the Delta plane was then "clear of the runway." The fact that it was "not very damn far off the runway" did not then prompt either of them to take or direct action then available to them to avoid whatever hazard, if any, the position of the Delta plane presented. Instead, they continued accelerating their speed for takeoff.

TWA proceeded west on 27L and passed the Delta craft. TWA's first officer, then in control, testified that as it came abreast of Delta there occurred a loud report (a popping noise) from the right side of the TWA craft. Hearing it, the first officer assumed he had hit the Delta craft. The TWA craft had in fact not come in contact with Delta; rather the evidence tended to show that TWA may have experienced a compressor stall in its outside engine on the starboard wing (the wing nearest to Delta). A compressor stall is not an uncommon event; it sometimes may occur when a jet aircraft travels through the jet exhaust of another, and it usually causes only a momentary pop in the engine. If such a compressor stall does occur, it does not impair the controllability of the plane.

There was evidence that earlier the same day the TWA plane, then manned by a different crew and on a different leg of its day's flight, had experienced several compressor stalls, not caused by any outside agency such as going through the jet exhaust of another. No direct evidence was presented that the "pop" of a compressor stall on the involved TWA plane, if such actually oc-

curred while passing the Delta plane, was caused by the jet wash from the Delta plane.

When the TWA first officer heard the popping noise, he initiated abort procedures. At that time, the speed of the TWA craft had already exceeded V1, the last speed at which a successful abort could have been accomplished. The decision to abort was entirely that of the first officer, and it was made without his knowing or seeking to know the speed of the plane, and consequently without any assurance that it could be safely done. Such lack of awareness was the direct consequence of Captain Matheny's breach of his duty to call out the critical speeds.

The TWA Boeing 707 Flight Handbook contained the following:

"a. Aborting a takeoff at high speeds is potentially dangerous and should not be attempted unless an actual engine failure has occurred *prior to V1*. Under the balanced runway length concept an abort at V1 that is perfectly executed will require every foot of the remaining runway. Anything less than a maximum effort throughout the entire stopping attempt will probably result in running off the end of the runway. Barring an actual engine failure (prior to V1) *the aircraft has a greater capability to successfully continue the takeoff than to stop.*"

"b. *If an engine failure, or other abnormal indications, occurs after* V1, *continue takeoff using the same technique as for a four engine takeoff.* To maintain directional control, be alert and aggressive on the rudder. Some aileron control may be required." (Emphasis supplied.)

Similar information was contained in the TWA Transportation Training Bulletin No. 66-9:

"Considering a condition of maximum weight for the runway, and, the balanced runway length concept, *an aborted takeoff at* V1, *that is perfectly executed will require all of the re-*

*maining runway to effect the stop. Anything less than a maximum effort throughout the entire stopping attempt will probably result in running off the end of the runway.*

"V1 is referred to as 'decision speed'. *On takeoff, it is the First Officer's duty to call out* V1 *and* Vr. *Once the rotation has started, the takeoff should be completed. Aborting a takeoff at high speeds is potentially dangerous and should not be attempted unless an engine failure has occurred prior to* V1.[4] Engine failure will manifest itself by either yaw or loss of performance indicated by multiple engine instrument indication. Many times a takeoff has been aborted unnecessarily on a single, unconfirmed indication. Unless an engine failure occurs before V1, the aircraft has a greater capability to successfully continue the takeoff than to stop. Remember, all runway takeoff charts are based on one engine becoming inoperative at V1. Before attempting an aborted takeoff, be certain the abort is necessary.

\* \* \* \* \* \*

"V1 has been referred to as the 'decision speed.' It is interesting to note that two seconds are allowed for this decision. By definition, V1 is the speed at which point the pilot is offered two prerogatives, to continue, or to stop. Considering that the aircraft is loaded for the runway, it is only at this point that the aircraft has the capability of doing either. Below V1 the aircraft does not have the capability of accelerating to the required lift off speed and clear the runway end at 35'. *Above* V1-*the aircraft does not have the capability of stopping on the runway remaining.*" (Emphasis supplied.)

The evidence showed that before and at the time the decision to abort was made, the TWA plane had reached a speed of 143 to 145 knots, substantially above the V1 speed of 132 knots. Thus, the abort was attempted notwithstanding the above quoted rule that "above V1, the aircraft does not have the capacity of stopping on the runway," and the Flight Handbook admonition, "If an engine failure, or other *abnormal indications*, occurs after V1 continue takeoff using the same technique as for a four engine takeoff."

TWA Captain Volney D. Matheny, a pilot of much experience, had never met his first officer, Ronald Gene Reichardt, a younger and less experienced pilot, 27 years of age, prior to the day of the flight in this case. No discussion as to procedures or division of responsibilities in accomplishing the planned takeoff was had between these officers. The log on the TWA plane recorded that compressor stalls had occurred earlier in the day in question. Captain Matheny testified that he had read the log prior to takeoff, but could not remember the notation of compressor stalls. The first officer, who was aware that he would be in control of this flight, did not consult the log, even though TWA regulations required its pilots to examine the airplane's log before undertaking to operate it. In all events, there was no evidence that a compressor stall, if one occurred, would, or did, impair the handling of the plane.

TWA's first officer Reichardt testified that he heard "a loud report from the right hand side of the aircraft [the TWA plane], felt some roughness as I crossed abeam of the aircraft [the Delta plane]," and further "[t]hat, in combination with our closeness as to the vicinity of the aircraft [the Delta plane], led me to believe I had possibly hit the Delta aircraft." Other than these observations, there was no evidence that the Delta plane was a hazard

---

4. There was no evidence that the TWA plane, before or at the time of passing the rear of the Delta plane, experienced "an engine failure". If it be assumed that the noise or "pop" which led the first officer on TWA to believe he had hit the Delta plane, was a compressor stall, such an event was not "an engine failure."

to or in any degree impaired a normal takeoff of the TWA plane. First Officer Reichardt went on to say, "To my recollection, we remained straight down the runway."

Captain Matheny, who testified regarding the effect of a compressor stall, said that after a compressor stall with its accompanying "pop", the engine will again run smoothly. He testified:

"Q. And the engine does continue to run?

A. Yes.

Q. So that if the pop represented a momentary compressor stall, in effect it did not at all affect the flight of TWA in its takeoff roll?

A. That's true, if I am correct in thinking, it was momentary.

Q. Well, have you ever experienced a compressor stall that was more than just momentary?

A. No.

Q. Have you ever lost an engine because of a compressor stall?

A. No.

Q. Now, even if you had lost an engine on this occasion due to compressor stall, would you have been able to continue the takeoff roll of TWA 159 and achieve a lift off?

A. I think that I could have, yes.

Q. All right, sir, and certainly if the compressor stall was momentary as you described it, the plane, had not the abort been initiated, could have continued to a normal takeoff, is that right, sir?

A. Yes, that's right."

Captain Matheny, who heard a noise in the TWA cockpit but experienced no abnormal action of the plane as it passed Delta, believed at the time that the TWA plane had experienced only a compressor stall. He testified that it was a mistake for the first officer to attempt the abort. In addition, Matheny testified that the TWA procedure which allowed the first officer to initiate the abort may have been unsound in this situation. We quote the following from his testimony:

"Q. Now, based upon your experience as a TWA Captain with some 21,000 hours of flight experience, do you feel that it is good, sound, safe airmanship to permit the abort decision to be made by the First Officer when he is making the takeoff?

A. No, I do not.

\*    \*    \*    \*    \*    \*

Q. Now, if you had known prior to the initiation of this takeoff that there was a DC-9 in the vicinity of the runway, would you have permitted the First Officer to make the takeoff under those circumstances?

A. No."

There was evidence that after the accident here involved TWA adopted a policy that a decision to abort was to be made by the Captain. This put TWA in line with the policy of other major airlines.

Captain Matheny also testified that an aircraft is not obliged to go ahead with a takeoff merely because the control tower gives it a clearance to do so. Both Captain Matheny and his first officer, Reichardt, testified that had they looked they could have seen the Delta plane near to their runway, and that they had received the information that while the Delta aircraft was off the runway it was stuck in the dirt. The following from Captain Matheny is pertinent:

"Q. At any time during the takeoff roll, did there come a time when you did not have a clear runway before you?

A. No."

Under the above facts, Delta's position near the runway was not a hazard to TWA's successful completion of its takeoff. Also, even if the jet wash of Delta's engines across the runway caused a

compressor stall on the TWA plane, this created no impediment to a successful takeoff. Without further extended and detailed discussion in the evidence, we express our view that *but for* the erroneous judgment of the TWA first officer, that he had struck the Delta plane, followed by his attempt to abort the flight without knowing, or having been advised, that he had exceeded the speed at which the abort could be successfully accomplished, the casualty here involved would not have occurred. The immediate, proximate cause of the casualty was made up of the first officer's erroneous belief that he had hit the Delta plane when his own view made it clear to him that he could not have done so, and the captain's failure to fulfill his obligation to keep the first officer advised of the attained speeds.

*I. Proximate Cause.*

█ If it can be said that Delta was negligent because it got stuck in the dirt *just off the runway,* its position was observable by TWA. There remained sufficient time for TWA to accommodate its procedure to Delta's position. Delta's negligence, if any, had ceased to be a factor in causing the casualty here involved. It was neither the sole proximate cause, nor one of the proximate causes, of the accident.

The only contribution that the Delta plane could have made to the TWA first officer's erroneous conclusion that he had hit the Delta plane must derive from the fact that as TWA was making its takeoff run, the Delta plane was sitting at substantially right angles to TWA's runway. In this position, its engines were at idle throttle, resulting in its jet wash passing across the runway. This fact, however, was known, or could have been known, by the TWA crew. Captain Matheny testified:

"As we approached Delta * * * in the takeoff roll, I noted that,

though he was indeed clear [clear of the runway], he remained very close to the runway and parked in a manner that directed jet blast at right angles to the direction of our takeoff."

If the position of the Delta plane was, or could have become, a hazard to the TWA plane, this fact was known to the TWA crew as it proceeded with its takeoff run. Captain Matheny further said:

"Q. Were you aware, then, as of November 6, 1967, that a jet aircraft making a takeoff on the runway passing through a jet exhaust of another aircraft might sustain a compressor stall as a result of that? Did you know that?

A. Well, I think, whether or not I received any of those bulletins —which I say I don't remember receiving—that I would have felt that was very hazardous, and that a compressor stall could occur under those circumstances."

Evidence that the TWA crew could have seen the mired Delta plane at the time they were given takeoff clearance was not denied. They had received the information that Delta had attempted a 180° turn, that it had failed to complete the turn, and that it was stuck in the dirt off the runway. In addition, the position of the Delta plane was observable from the airport control tower, a point further away from Delta than the point where TWA was waiting to begin its takeoff.[5] The TWA captain gave the following testimony on the subject:

"Q. Now, were you able to tell at the time you received your second clearance whether or not Delta 379 was moving or stationary?

A. I don't know whether I could or not.

---

5. Although the Delta plane was not completely illuminated by its own lights, it did have its anti-collision beacons and wing lights turned on. With these lights and the landing lights with which TWA was equipped, the TWA crew could see the Delta plane's location.

**1046**

Q. Well, did you see the aircraft down there at that time?

A. I don't know.

Q. Well, was there anything that would have prevented you seeing the aircraft if you had looked for it?

A. I don't think so?

When the TWA crew consciously observed the location of the Delta plane, there was still time to abort their flight if the Delta plane was a hazard. No abort was then attempted. The TWA captain testified that notwithstanding the proximity of Delta to the runway, with its exhaust crossing the runway, the lift off—becoming airborne—would have, and could have, been accomplished but for the mistake of the copilot of TWA. We are persuaded that any negligence of Delta in maneuvering its plane off the runway ceased to be a causative factor in the conduct of TWA.

■ The Kentucky law of proximate cause is substantially the same as most of the other states. It is controlling here. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In Morris v. Combs' Adm'r, 304 Ky. 187, 200 S.W.2d 281 (1947), the Kentucky Court of . Appeals defined proximate cause as:

"that which, in a natural and continual sequence, unbroken by any new, independent cause produces the injury, and without which the injury would not have occurred." 204 Ky. at 191, 200 S.W.2d at 283.

■ In determining whether an intervening act shifts proximate cause, the following test has been established:

"It is elementary that if a cause is remote and only furnishes the condition or occasion of the injury it is not the proximate cause thereof. To be proximate, a cause is not required to be the last link in the chain of events. An act or force may intervene without breaking the chain of cause and effect, so long as the intervening force or act is not the superseding cause.

*A superseding cause relieves the original negligent actor from liability irrespective of whether the antecedent negligence was or was not a substantial factor in bringing about the injury* * * *. (Emphasis supplied.) "* * * The question is primarily one of fact. If the original negligent act set in force a chain of events which the original negligent actor might have reasonably foreseen would, according to the experience of mankind, lead to the event which happened, the original actor is not relieved of liability by the intervening act. If, however, the ultimate injury is brought about by an intervening act or force so unusual as not to have been reasonably foreseeable, the intervening act is considered as the superseding cause and the original actor is not liable." Hines v. Westerfield, 254 S.W.2d 728, 729 (Ky.1953).

■ In our review of this case, we are, of course, mindful of the general rule that the question of proximate cause is for the jury to determine. *See* W. Prosser, Law of Torts § 52, at 329 (3d ed. 1964). However, the Kentucky courts have recognized that,

"where the uncontradicted evidence is such that only one conclusion can be drawn therefrom by fair-minded men and that conclusion is that negligence of a party to an accident was the proximate cause, there is no issue of fact to be submitted to the jury and the court has the duty of determining the case as a matter of law." Jewell v. Dell, 284 S.W.2d 92, 95 (Ky.1955).

The facts in the case of Newton v. Wetherby's Adm'x, 287 Ky. 400, 153 S. W.2d 947 (1941), make its decision helpful to resolution of the issue presented here. In *Newton* a motorist, Dr. Wetherby, invited a young man, Newton, to ride in the right front seat of the doctor's automobile. After making a stop, the doctor and his passenger re-entered the car. The eleven-year-old passenger closed the right front door, but failed to do so securely. Plaintiff's theory of re-

covery was that while traveling at high speed, the door rattled. It could have been inferred that the doctor heard the rattling door, and that he should have corrected the situation. When eleven-year-old Newton attempted to secure the door, he was unaware that the door was hinged on the rear. Newton did open the door, at which time it flew open and the young man was thrown from the vehicle.

Assuming that negligence could be charged to the doctor's failure to see that the doors were secure and his failure to take notice of the rattling of the front door, the Kentucky court found that the proximate cause of the accident was the young man's opening of the door. The Court said:

"But though it be assumed that Dr. Wetherby was negligent, it seems clear that such negligence was not the proximate cause of appellant's injuries. When an independent act intervenes between a defendant's negligence and the injury sustained, such act breaks the causal connection between the negligence and the damage. And where the negligence does nothing more than furnish a condition or give rise to the occasion by which an injury is made possible it cannot be made the basis of a recovery if there intervenes between it and the injury a distinct, successive, unrelated, efficient cause of the injury. *If no danger existed in the condition except by reason of the independent cause such condition was not the proximate cause.*" 287 Ky. at 403, 153 S.W.2d at 949. (Emphasis supplied.)

In the instant case, the testimony was undisputed that had the first officer continued his takeoff roll after passing to the rear of Delta, the plane would have become airborne. Captain Matheny testified that the jet wash of the Delta, of which he was aware, would not have been an impediment to the takeoff. Neither did the position of the Delta plane prevent a normal takeoff by TWA. There was no dispute but that it was clear of the runway. After seeing Delta, the TWA plane continued on its course down the middle of the runway; its takeoff procedure was in no way changed or affected by passing to the rear of the Delta plane.

The first officer's testimony as to what led him to the belief that he had hit the Delta plane is as follows:

"Q. And what occurred when you passed abeam of the aircraft?

A. I felt some roughness in the controls and received a loud report from the right-hand side of the aircraft.

Q. And then what, sir?

A. The report from the right-hand side of the aircraft and the roughness I felt in the controls led me to believe that I had hit this aircraft. I decided at that time to abort the aircraft."

The only testimony to explain the "loud report" is that of Captain Matheny who had judged the noise to be a compressor stall. He felt that the noise which emanated from the right side of the plane was somewhat louder than other compressor stalls he had heard, but he indicated that the volume of the "report" would be in proportion to the amount of "thrust" of the plane.

"Q. Meaning the higher the thrust the louder the noise?

A. Yes.

Q. But what I'm getting at is, is it a sharp, sudden report, or is it a dull, muffled type of sound?

A. The report we had on 159 [flight in question] was rather sharp, but I think all others that I have had have been rather subdued."

Captain Matheny was aware that the Delta plane's exhaust was crossing the runway. The first officer did not say whether he did or not know about it. Although TWA was in radio communication with the control tower and was capable of calling Delta, no inquiry was made as to whether Delta's exhaust was crossing TWA's takeoff path. In all events the crew of TWA observed the

Delta plane and its position off the runway at a time when, if it was a hazard, the TWA plane could have been aborted safely. In addition, the evidence was clear that this compressor stall in no way affected the navigability of the TWA plane or impaired its opportunity for a safe and uneventful takeoff.

■ What, then, was the immediate or proximate cause of the TWA first officer's decision to abort the flight? It was a combination of his mistaken conclusion that he had hit the Delta plane and his unawareness that the speed of his plane already exceeded that at which the takeoff could safely be aborted. This latter lack of knowledge was in no way chargeable to Delta; it was caused solely by the TWA captain's failure to call out the critical takeoff speeds. We are of the view that if there was any negligence chargeable to the Delta crew in getting their plane stuck adjacent to the runway, such negligence had ceased to be a causative factor in the ultimate casualty. The errors and failure of duty by the TWA crew were the efficient and sole proximate cause of the accident. The Delta plane did no more than,

> "furnish a condition or give rise to the occasion by which an injury is made possible it cannot be made the basis of a recovery if there intervenes between it and the injury a distinct, successive, unrelated, efficient cause of the injury. If no danger existed in the condition except by reason of the independent cause such condition was not the proximate cause." Newton v. Wetherby's Adm'x, supra, 287 Ky. at 403, 153 S.W.2d at 949.

We find additional support for this conclusion in our own decisions which have considered the Kentucky rule of proximate cause. In Michael v. United States, 338 F.2d 219 (6th Cir. 1964), a mail carrier, in violation of a Kentucky statute, had stopped his vehicle partly on the travelled portion of a road. The presence of this vehicle caused another to stop behind it, with both such vehicles blocking the northbound lane of the highway. Another northbound vehicle, travelling at a high and illegal rate of speed, attempted to go around the stopped vehicles, but his speed was such that he caromed off one of the vehicles into the southbound lane, where a head-on collision with plaintiff occurred. The District Judge found that the illegal driving of the speeding car was an intervening cause that eliminated the illegal parking of the mail carrier's car as a proximate cause of the accident. We affirmed the District Judge, saying:

> "Another rule of Kentucky law apposite to this case is that one guilty of negligence will not be charged in tort if some independent intervening cause interrupts the chain of causation so as to render such negligence so causally remote as not to be considered a proximate cause. One expression of the Kentucky rule is that 'if an independent cause intervenes, which is of itself sufficient to produce the result, it is regarded as proximate cause, and the originator of the first cause is relieved from liability.'" Michael v. United States, 338 F.2d at 220.

In Black v. United States, 441 F.2d 741 (5th Cir. 1971), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971), a pilot of a small aircraft had made an inquiry of a Flight Service Station as to weather conditions in the area in which he was flying. His inquiry was answered, but the attendant at the station made no inquiry of the pilot's destination as required by a relevant regulation reading:

> "439.2 Whenever a SIGMET or Advisory to Light Aircraft exists which involves an area within 150 miles of the station, request the pilot's route and destination. Transmit the weather advisory if it is relevant."

Had this regulation been followed, the required inquiry would have disclosed that the plane was enroute to Fort Worth where it would encounter adverse weather conditions. The plane crashed when it encountered a severe storm, killing all aboard. A judgment was award-

ed to the estate of the passengers on the plane against the United States for the negligence of its agent in failing to comply with the above quoted regulation. The United States conceded the negligence of its weather station agent, but argued that such negligence was not a proximate cause of the fatality because it had been superseded by the negligence of the plane's pilot which was the immediate and efficient cause of the tragedy. The trial judge held that the negligence of the government agent and the plane's pilot concurred to provide the proximate cause.

In reversing the District Court, the Fifth Circuit said:

"When the pilot saw the storm he had to make a decision either to proceed, to alter or reverse his course, or to land. His decision was to proceed. From then on can it be said that the failure of the operator almost two hours earlier to warn him of Sigmet Charlie 2 [the storm] proximately

contributed to that decision? We think not." 441 F.2d at 745.

"Appellant's negligence had 'so far spent itself as to be too small for [the] law's notice,' and was so completely superseded by that of the pilot that it was no longer a material element contributing to the tragic results that ensued. In our judgment the findings of the lower court on the issue of proximate cause are clearly erroneous." 441 F.2d at 746.

We believe the Fifth Circuit's decision provides analogy for our decision.[6]

## II. Contributory Negligence.

We hold that the action of TWA against Delta was barred by contributory negligence on the part of the crew of the TWA plane. Contributory negligence is a defense in bar under Kentucky law. Williams v. Chilton, 427 S.W.2d 586, 591 (Ky.1968); Banner Transfer Co. v. Morse, 274 S.W.2d 380, 382 (Ky. 1954).

6. Our conclusion that conduct of Delta was not a proximate cause of the casualty, and that TWA was, as a matter of law, guilty of contributory negligence, obviates a determination whether or not Delta was guilty of negligence. We think, however, that we should expose the basis of Appellee's charge that Delta was negligent. The TWA brief charges that the Delta crew was negligent in overshooting runway 18–36 and choosing—with the tower's permission—to turn around to permit exiting on 18–36; that they should have gone on to another runway further to the west.

The failure of the Delta crew to successfully exit on runway 18–36 was known to the tower and the TWA crew before the latter started to take off. Delta, advised of the imminence of a take off by the TWA plane, was seeking to get out of the way and there was no evidence that the mud that frustrated the success of their exit was observable before they actually got into it.

TWA argues that when the tower asked the Delta crew whether they were "clear of the runway" Delta should have done something more than make the truthful answer they did give; that they should have expressed a view that their position was a hazard to any plane taking off. They did, however, immediately mention that they were stuck in the mud. This information was given to TWA and neither the tower nor TWA made inquiry for more detailed information as to the actual

dimension of Delta's being "clear of the runway." In his opinion exonerating the United States of fault, the District Judge observed:

"The government in this lawsuit has claimed that the *sole proximate cause of this accident* was 'patently' TWA's failure to abort when its crew first saw where Delta was." The tower was apparently satisfied with the information which it had obtained from Delta, and upon which it acted in telling TWA to proceed. The TWA crew did not indicate any inadequacy in Delta's answer to the tower and it knew that Delta was stuck in the mud.

Conversely to the government's casting of fault on TWA, is the latter's counter attack in its cross-complaint against the United States wherein it charges that damages suffered by its passengers—the Rosenthals—were "*a direct and proximate result of the negligence * * * of the said agent [the tower man] an employee of the Federal Aviation Administration.*" (Emphasis supplied.)

Upon trial, the tower man and one of the TWA crew, without any relevant qualification therefor, testified that "clear of the runway" meant that the Delta plane was a sufficient distance so as not "to constitute a hazard to the runway." These statements were gratuitous and no one said what distance would be required before a "yes" could be given to the tower's inquiry of Delta as to whether it was clear of the runway.

■ Ordinarily such question is for resolution by the jury. Banner Transfer Co. v. Morse, 274 S.W.2d 380, 382 (Ky.1954); Padgett v. Brangan, 228 Ky. 440, 15 S.W.2d 277 (1929); Hardware Mutual Casualty Co. v. Union Transfer & Storage Co., 205 Ky. 651, 266 S.W. 362 (1924). However, "where fair-minded men may properly draw but one conclusion from the testimony adduced, the question of whether or not a person is guilty of contributory negligence becomes a matter of law for the court to decide." Louisville & Nashville Railroad v. Hines, 302 S.W.2d 553, 556 (Ky.1956). See Banner Transfer Co. v. Morse, supra, 274 S.W.2d at 382.

■ If contributory negligence is to constitute a bar to recovery, it must be shown to have been proximate, and not remote in causation. Travis v. Hay, 352 S.W.2d 209, 211 (Ky.1961). This rule was expanded upon by the court in Louisville & Nashville Railroad v. Hines, supra, 302 S.W.2d at 556, where the court stated:

"It is not necessary that the contributory negligence be the sole cause of the accident from which the injury flows; it is sufficient if it contributed to the accident to such an extent that but for the concerted action the same would not have occurred. Contributory negligence on the part of the injured person necessarily assumes negligence on the part of the person against whom recovery is sought, but if the contributory negligence on the part of the injured person was such that without it the injury would not have been received, such person is not entitled to recover."

■ We believe our recital of the evidence in our consideration of proximate cause adequately portrays the negligence of the TWA crew. By way of summary, we add the following observations:

Notwithstanding all that was known and had occurred before the illfated attempt of the first officer to carry out an abort, Captain Matheny was satisfied that the plane would have, and could

have, become airborne if the first officer had merely continued his takeoff. The first officer said nothing about his plan to attempt an abort, and the captain was taken by surprise when the abort was initiated. His surprise is evidenced by his exclamation:

"I thought I said, 'My God, what are you doing?' "

He was then asked:

"Q. Well then, do you recall that the First Officer said 'sorry.'?

A. I remember that.

Q. Anything else or just the word 'sorry.'

A. I just remember the apology, I don't know just what he said."

Captain Matheny took no part in the first officer's decision to attempt the abort, and a fair reading of his testimony exposes his belief that the real cause of the casualty was his less experienced first officer's obvious panic in attempting the abort, unaware of the then attained speed of the plane. The captain, who had failed in his duty to call out the critical speed, was surprised to learn that the plane had attained a speed of 145 knots—greatly in excess of the critical V1 speed of 132 knots. The following portrays the scene within the TWA cockpit:

"Q. As a matter of fact, you were caught by surprise by this abort, weren't you?

A. Yes.

Q. And it was because you were caught by surprise that there was some delay in your getting with the abort procedure, isn't that true?

A. That's probably true. Yes."

The TWA captain and the first officer both testified that they did not know their plane's speed when they passed Delta. The first officer said, "I have absolutely no idea as to whether [when abeam of Delta] I had achieved V1 or not."

We are satisfied that upon fair consideration of the evidence the only conclusion that can be reached is that negligence of the TWA crew contributed to the casualty. This we hold as a matter of law, and appellee's action must accordingly fail. Louisville & Nashville Railroad v. Hines, 302 S.W.2d 553 (Ky. 1956); Banner Transfer Co. v. Morse, 274 S.W.2d 380, 382 (Ky.1954).

*III. Motion for New Trial.*

Our above ruling makes it unnecessary to consider refusal to allow an expert witness called by Delta to answer several questions; this is true also of the claimed impropriety of argument to the jury by TWA counsel.

However, understanding of the jury's verdict in the face of the above detailed evidence will be aided by some discussion of the background which gave rise to the alleged improper jury argument. A tape recorder was in operation in the Delta cockpit during, and just prior to, the happening of the relevant and exciting events. This could have recorded conversation in the Delta cockpit during and immediately after efforts to get the Delta plane off.the runway. However, a button on the Delta recorder was pressed, activating an erasing mechanism which eliminated such conversation. The reasons given by the Delta crew for such erasure could lead to a sophisticated conclusion that they were trying to cover up some misconduct. The Delta crew said that its captain, in the annoyance that followed his getting stuck in the mud, had used profanity, including some four letter words, which he did not wish perpetuated. Delta also claimed that it was customary to make such erasure at the conclusion of a flight.

We would not fault a jury for questioning the truth of the asserted excuses for erasing the tape nor blame an able advocate for exploiting the apparent hiding of evidence by his opponent's witnesses.

The Delta cockpit voice recorder tape was played to the jury; this covered that part of the tape which had been erased as well as that which followed the erasure. TWA Exhibit 6 was a transcript of that portion of the cockpit voice recorder which followed such of it as was erased. The transcript is as follows:

TRANSCRIPT OF FIRST PORTION OF THE COCKPIT VOICE RECORDER TAPE FROM DELTA AIRLINES FLIGHT 379, DC–9, N33176, GREATER CINCINNATI AIRPORT, NOVEMBER 6, 1967, OF INTEREST TO THE ACCIDENT INVESTIGATION OF TWA FLIGHT 159.

LEGEND

CAM —Cockpit Area Microphone Circuit
* —Non-pertinent transmissions
% —Unintelligible word or phrase
# —Non-pertinent word or phrase

| Time | Source | Content |
|---|---|---|
| 2343:51 | CAM | All those people are killed |
| | | # |
| | | # |
| 2344:03 | CAM | I, I just wondered if, if us sitting here—I don't know |
| | CAM | Shh! |
| | CAM | I sure hope— |

[See following page]

| Time | Source | Content |
|------|--------|---------|
| 44:20 | .CAM | (%%) Voice Recorder |
| | CAM | Sure it's runnin'? |
| | CAM | %% |
| 44:30 | CAM | We have nothin' really to speak of |
| | CAM | Fire is burning |
| 2345:02 | CAM | Damn nose wheel slid out |
| | CAM | Yeah, it's cocked all the way over |
| 45:10 | CAM | Well, that's why we started to (rest of conversation overriden by communications emanating from cockpit speaker) |
| | CAM | Yeah, if I can (overriden) |
| 45:15 | CAM | If I could have gotten straightened (Overriden) we would have |
| 45:57 | CAM | I guess we're off the runway. I don't know |
| 2346:03 | CAM' | When he went by us he was, he was, he was in reverse already and I (pause) I couldn't actually—I said ## what the hell's the noise you know, and I felt the air rush— |
| | CAM | Yeah |
| | CAM | —the airplane |
| 46:23 | CAM | Oh boy! |

\* \* \* \* \*

| Time | Source | Content |
|------|--------|---------|
| 2349:07 | CAM | I wonder if the exhaust of our engines had any effect on him |
| | CAM | No, he was in reverse already when he went by |
| | CAM | Yeah |
| 2349:24 | CAM | (%) I've taken off many time at O'Hare with guys just turning off— |
| | CAM | Yeah |
| | CAM | —and you just go by. There's nothin' really to it. Ya got speed |
| | CAM | Yeah |
| 2349:33 | CAM | He was in reverse thrust when, when I saw him. The tower says are you clear of the runway and I says roger we are |
| | CAM | Yeah |
| 2349:41 | CAM | And I could s—— then I saw this guy comin' at us. Boy he was just a-roarin' you know when he went by us. Of course it blasted the tail and, uh, all that noise, I'll tell ya, it was close |

———◆——

Such speculations by the Delta crew, as set out in the preceding transcript and the earlier evidence, would indeed provide able counsel with a fertile field for jury argument. While it portrays the Delta crew's excitement and wonder whether they might have been at fault, none of the miscellany set out above impairs the correctness of our analysis of the facts.

The panel sitting on this case has had the entire Delta cockpit voice recorder tape played to them. This included the portion of the tape which was erased. While such portions produced audible sounds at maximum volume, such sounds

were without significance critical to the decision of this case.

The specific part of TWA's closing argument which Delta claims was prejudicial is the following:

"Now, let's just consider a minute about what they [the Delta pilots] said they were doing there. The sitting down doing nothing in idle is improbable. You will hear the Judge instruct you on the evidence and the credibility of witnesses. I am not going to tell you how to do it. Of course, you are considering all the time probabilities, so you could consider how a witness handles himself on the stand and how he parries questions.

*"It is our position here, and I submit to you, that in fact what was happening during that 30-second period was that they were trying to blast that plane further off the runway."*

Counsel then went on to "ring the changes" on the inference which he argued could be drawn from the erasure of the tape. Experienced advocates will be aware of the devastating use that can be made of what appears to be an effort to destroy evidence. We discuss it as our speculation as to how a jury was persuaded to cast the blame for this casualty upon the Delta crew.

*IV. New Trial as to Delta's Cross-Claim Against TWA.*

This lawsuit had its beginning as a personal injury action by the Rosenthals against Delta and TWA.[7] The procedures which followed and the question presented is set out in Delta's address to us.

"Delta asserted a cross-claim against TWA seeking either complete indemnity or contribution, pursuant to the law of Kentucky, for any amounts which Delta might be required to pay to the plaintiffs.

"During trial counsel for Delta submitted a requested instruction to the jury on the law governing the jury's consideration of that cross-claim. The District Court decided that the cross-claim of Delta against TWA would not be submitted to the jury initially but, if the jury should return verdicts in favor of the plaintiff and against both TWA and Delta, the court would then immediately instruct the jury with respect to Delta's cross-claim against TWA and send the jury back to deliberate and return a verdict on the cross-claim.

"In view of the fact that the jury returned its verdicts in favor of each plaintiff and against Delta alone, there was no occasion to submit to the jury Delta's cross-claim against TWA and the District Court entered judgment on that cross-claim in favor of TWA. If the verdicts and judgment in this case are permitted to stand, they would be adjudicative of the issues raised on Delta's cross-claim against TWA and there would be no basis for a new trial on the cross-claim.

"In the strictest sense, there was not any trial at all on Delta's cross-claim against TWA because that claim was never submitted to the jury. We have, however, asked for a new trial on that cross-claim because, in the event that final judgment should be entered in favor of Delta or a new trial should be granted, Delta should be entitled to take its case to a jury on its cross-claim against TWA.

"If, after a new trial, the jury should find that TWA alone was negligent, Delta would be entitled to be indemnified by TWA for such amounts as it has paid to the Rosenthals in satisfaction of their judgments. Should the jury find that both Delta and TWA were negligent and that their negligence directly and proximately contributed to the injury to Mr. Rosenthal and the death of Mrs. Rosenthal, then under the law of

7. Most of the passengers and crew of the TWA plane got out before it burned up. Only the Rosenthals brought suit.

**1054**

Kentucky each should be required to pay half of the amounts paid to the Rosenthals."

TWA's brief does not discuss the question thus stated. On the basis of our holdings on proximate cause and contributory negligence, Delta is entitled to a trial on its cross-claim against TWA. We cannot, however, make final disposition of the matter by an order now to be entered. Delta's cross-claim was never submitted to a jury; neither was a motion for a directed verdict upon such cross-claim presented to the District Judge. We accordingly remand this phase of the matter for disposition by the District Court.

We remand the cause to the District Court for entry of judgment for Delta in the action brought against it by TWA–Federal and for further consideration by the District Court of the procedure to be followed regarding Delta's cross-claim against TWA for contribution and indemnity.